UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

CLEAR SPRING PROPERTY AND
CASUALTY COMPANY,

             Plaintiff/Counter-Defendant,

v.

VICTORY INSURANCE COMPANY,

             Defendant/Counter-Plaintiff.

No. 21-cv-01162
Judge Franklin U. Valderrama

**AMENDED MEMORANDUM OPINION AND ORDER**

Clear Spring Property and Casualty Company (Clear Spring) filed suit against Victory Insurance Company (Victory), asserting breach of contract, among several ither causes of action, and requesting a declaratory judgment, injunctive relief, and damages. R. 42, SAC.[1] Victory has asserted several counterclaims, including for breach of contract. R. 47, Ans./Counterclaims. Before the Court is Plaintiff's Motion for Entry of Preliminary Injunctions. R. 32, PI Mot. For the reasons that follow, the Court grants in part and denies in part Plaintiff's Preliminary Injunction Motion. Also before the Court is Clear Spring's Opposed Motion for Judicial Notice, which the Court grants. R. 64, Mot. Judicial Not.

## Background

Clear Spring is a property and casualty insurance company, and issues workers compensation policies to Montana insureds. SAC ¶ 6; R. 35, Hanfling Decl.,

---

[1]Citations to the docket are indicated by "R." followed by the docket number or filing name, and where necessary, a page or paragraph citation.

Exh. 1, MGA Contract at Art. I. Victory is also an insurance company, which Clear Spring appointed as its Managing General Agent (MGA) for Clear Spring's Montana workers compensation insurance program, in order to produce and manage workers compensation policies, including meeting Clear Spring's policyholder and reporting obligations. SAC ¶¶ 2, 10; MGA Contract at Art. I. In April 2019, Clear Spring and Victory entered into the Managing General Agent Contract (MGA Contract), effective November 10, 2018, which appointed Victory as Clear Spring's MGA to manage and administer "the day-to-day operations, business and affairs of [Clear Spring] related to the business produced and administered by Victory." R. 33, PI Memo. at 2 (citing MGA Contract at Art. I); R. 46, Resp. at 2 (citing R. 48, Brownfield Decl. ¶ 4).

Article VIII of the MGA Contract defines Clear Spring records (Records) as "all books, records, applications and other forms of information relating specifically to [Clear Spring] that are necessary to the performance of [Victory]'s obligations under" the MGA Contract, and specifies that those records "remain at all times the sole property of Clear Spring." MGA Contract Art. VIII(A). The same Article states that, "[d]uring the term of [the MGA Contract, Victory] shall provide [Clear Spring] and its designated representative, as directed by [Clear Spring], electronic access to the Records and with copies of the Records, if so requested by Clear Spring. . . . In the event [the MGA Contract] is terminated . . ., the Records will be turned over to Clear Spring or to a successor administrator designated by Clear Spring." *Id.* Art. VIII(B). The MGA Contract also specifies that, if it is terminated, Victory shall "turn over to [Clear Spring] all files, which shall include loss control records, reports, surveys and

correspondence, underwriting surveys and premium calculations, all active and closed claim files, insured's files, and readable form copies of all regulatory filings" (the Clear Spring Data). *Id.* Art. IV(B). "Subject to agreement between the parties hereto, the MGA will be paid a reasonable negotiated fee to: 1. Cooperate with any successor MGA in the orderly transfer of all functions; and 2. Provide timely media transfer of data." *Id.*

During the term of the MGA Agreement, Victory is required to keep "[s]eparate records of business written by [Victory] shall be maintained by [Victory] [and Clear Spring] shall have access and the right to copy all accounts and records related to its business in a form usable by [Clear Spring]." MGA Contract Art. II(D)(4). Also while acting as the MGA, the MGA Contract requires that Victory "provide comprehensive data processing and reporting, utilizing state of art hardware and software . . . [and that t]his data will be submitted to [Clear Spring] and its designated representative, as directed by [Clear Spring]." *Id.* Art. II(C).

At the time the MGA Contract was executed, Victory was using a product offered by Insurity LLC (Insurity) called Workers' CompXPress.[2] Brownfield Decl. ¶ 5. At that time, Clear Spring was not using Insurity or any other comparable system, but started using Insurity in or about December 2020. *Id.* ¶ 6.

---

[2]Workers' CompXPress is an integrated policy and billing system that allows clients of Insurity to manage the entire lifecycle of workers' compensation policy and data from the beginning of the application or quote process to renewal or cancellation. Brownfield Decl. ¶ 5. Insurity's Workers' CompXPress is not the only integrated policy and billing system used in the workers' compensation insurance industry. *Id.* ¶ 9. There are at least twenty other systems used throughout the industry. *Id.*

After execution of the MGA Contract, Victory purchased and then worked with Insurity to develop new proprietary software and information technology, which was different from Insurity's Workers' CompXPress system. Resp. at 7 (citing Brownfield Decl. ¶ 18); R. 50, Reply at 5 (citing https://www.insurity.com/wp-content/uploads/Insurity-Victory-WCXP-Success-Story-120820.pdf)[3]. This new system was eventually installed and comprised a nationwide Insurity program with compatible information technology and software systems that made use of Clear Spring's forms and rates, and which Victory used to sell Clear Spring policies using Clear Spring's rates and claims service in 47 states, including the five states that were the subject of the MGA Contract. Resp. at 7 (citing Brownfield Decl. ¶ 18). Victory incurred licensing fees, and employee time and wages and other expenditures to develop this new system and database. *Id.* (citing Brownfield Decl. ¶ 18). Victory's costs and expenses in connection with this effort (referred to as Victory's damages in its Counterclaim) are presently in excess of $2 million. *Id.* at 7–8 (citing Brownfield Decl. ¶ 19; R. 12, Counterclaim).

Both parties agree that the MGA Contract is now terminated. PI Memo. at 2 (citing Hanfling Decl. ¶¶ 4, 22, 37); Resp. at 3 (citing Brownfield Decl. ¶ 12; R. 49, Deola Decl. ¶ 6). On April 28, 2021, the parties agreed that through May 31, 2021,

---

[3]Although the Insurity and Victory news article is not referenced or authenticated in a Declaration, the Court may, at its discretion, take judicial notice of the contents of a website. *See Mussat v. Power Liens, LLC*, 2014 WL 3610991, at *3 (N.D. Ill. July 21, 2014) (citing *Denius v. Dunlap*, 330 F.3d 919, 926 (7th Cir. 2003)).

The parties present conflicting evidence about the purpose of Victory's development of its proprietary Insurity program. The Court need not decide the debate, however, as it does not find the *purpose* of the system's development to be relevant to the instant motion.

4

Victory would continue to manage and administer the Clear Spring policies, in association of Clear Spring's runoff of its business (April 28, 2021 Agreement). PI Memo. at 3 (citing Hanfling Decl. ¶ 10; *id.* Exh. 5); Resp. at 5 (citing Brownfield Decl. ¶ 13). On May 12, 2021, Clear Spring first called, then wrote to Victory, asserting its ownership of the data, demanding access to the Clear Spring Data, and stating that it needed to transfer the data to a successor MGA. *Id.* (citing R. 36, St. Pierre Decl. ¶¶ 3–4; Hanfling Decl. ¶¶ 11, 21; *id.* Exh. 6). The next day, pursuant to a request from Victory, Clear Spring identified precisely what data it was seeking from Victory, but did not specify the format in which it was requesting the data.[4] PI Memo. at 3 (citing Hanfling Decl. ¶ 23; *id.* Exh. 8; R. 34, Beal Decl. ¶¶ 15–18; *id.* Exh. 1).

On May 27, 2021, Victory and Clear Spring agreed that Victory would continue to assist Clear Spring and service policies from June 1, 2021 through August 2, 2021 in exchange for Victory earning a fee of six percent (6%) of all Clear Spring earned premium (earned monthly) to be paid monthly and netted from collected Clear Spring premiums in connection with Clear Spring's run-off of its business which Victory was administering (May 27, 2021 Compensation Agreement) (together with the April 28, 2021 Agreement, the Informal Agreements). PI Memo. at 3–4 (citing Hanfling Decl. at ¶¶ 10, 28); Resp. at 5 (citing Deola Decl. ¶ 14; Brownfield Decl. ¶ 13). As part of the negotiations leading to the May 27, 2021 Compensation Agreement, Clear Spring

---

[4]Specifically, the May 13, 2021 letter requested, "[a]t a minimum . . . Application and policy information[;] Underwriting files[;] Loss control records, reports, and surveys[;] Policy issuance information[;] Premium calculations[;] Billing statements[;] Payroll reports[;] Payments received[;] ACORD certificates[;] Policy[;] correspondence[;] Claims data (paper and electronic files)[;] Readable form copies of all regulatory filings[; and] Data and filing reports to the regulatory organizations, NCCI, Mitchell EDI, and CMS Franco Signor.

wrote in an email that the data transfer remained Clear Spring's "priority," to which Victory responded the following day, contesting that Victory was not allowing the transfer of data to other vendors, and stating that Victory has "continuously forwarded information requested from [Victory]" and that "[t]he only 'data transfer' request was for data including Victory's proprietary data on a system purchased by Victory." Hanfling Decl. ¶¶ 28–29; *id.* Exhs. 11–12. Neither of the Informal Agreements is in writing, none of the communications leading up to the Informal Agreements specifies that Victory must transfer the Clear Spring Data in a particular format. Resp. at 5–6 (citing Deola Decl. ¶ 15; Brownfield Decl. ¶ 17).

The parties engaged in settlement negotiations regarding the instant case, which included negotiations about the data transfer, but negotiations ended on July 12, 2021. Hanfling Decl. ¶¶ 31–32. During the negotiations, the parties negotiated a short-term MGA agreement under which Victory would continue to manage and administer Clear Spring policies and handle claims util October 1, 2021. SAC ¶ 98; Hanfling Decl. ¶ 36; *id.* Exh. 17. Sometime before July 14, 2021, Victory offered to have Clear Spring come to Victory's offices and copy the books and records of Victory sufficient to allow Clear Spring to fulfill its contractual obligations to insureds, but Clear Spring never did so. Resp. at 4 (citing Deola Decl. ¶ 11).

On July 14, 2021, Clear Spring wrote to Victory requesting that Victory provide "all accounts and records related to the Clear Spring book of businese[s] in a form usable to Clear Spring," pursuant to Section 33-2-1602(4) of the Montana Insurance Code. Hanfling Decl. ¶ 33; *id.* Exh. 14. This request included a list of "data elements,"

which Victory states "was a request for Victory's proprietary database on the system purchased by Victory." Resp. at 6 (citing Brownfield Decl. ¶ 21); Hanfling Decl. Exh. 14. Victory's counsel responded, requesting that Clear Spring not contact Clear Spring during the pendency of the litigation and stating that requests for documents, including the requested data, should be made through the formal discovery process. Hanfling Decl. ¶¶ 34, 37; *id.* Exhs. 15. In a follow-up email, Victory's counsel disputed that Clear Spring had a right to its data—specially "in a particular format"—under the Section 33-2-1602(4) of the Montana Insurance Code, the MGA Contract, or under the parties' current relationship. *Id.* ¶ 37; *id.* Exh. 18; *see also* St. Pierre Decl. ¶ 7. Victory has "at all times" informed Clear Spring that Victory would not provide to Clear Spring its Insurity system or database unless Clear Spring paid Victory for its expenses in creating the system and database. Resp. at 6 (citing Brownfield Decl. ¶ 21).

On August 11, 2021, the Montana Department of Insurance issued a letter to the parties, advising that it was considering an enforcement action. Hanfling Decl. ¶ 41; *id.* Exh. 21. In fact, on September 30, 2021, the Office of the Montana State Auditor (Montana Commissioner) issued a Notice of Proposed Agency Action and Opportunity for Hearing issued to Victory Insurance Company by the Commissioner of Securities and Insurance, and published on the Montana Commissioner's website (Proposed Agency Action Against Victory).[5] Mot. Judicial Not. at 1.

---

[5]The Court explains its decision to grant Clear Spring's Motion for Judicial Notice below. *See infra* Section I.

Also on August 11, 2021, Clear Spring first identified Tristar Insurance Group (Tristar) to Victory as Clear Spring's designated Third-Party (claims) Administrator (TPA). Resp. at 6 (citing Brownfield Decl. ¶ 22). On August 23 and 24, 2021, at Tristar's and Clear Spring's request, Victory transferred all of the data relating to claims files for Clear Spring insureds to Tristar. *Id.* (citing Brownfield Decl. ¶ 22). This data was contained in Excel Spreadsheets, Portable Document Format files (PDFs), Microsoft Word documents, Microsoft Power Point documents, JPEG images and Microsoft Outlook emails. *Id.* (citing Brownfield Decl. ¶ 22). All of these documents are electronic and contain data. *Id.* (citing Brownfield Decl. ¶ 22). As of August 24, 2021, Tristar has all the data it needs to adjust claims. *Id.* (citing Brownfield Decl. ¶ 22). As of August 24, 2021, Victory had only approximately two hundred open claims for all Clear Spring policies. *Id.* (citing Brownfield Decl. ¶ 23). Based on the information that Victory has provided to Tristar, Tristar should be able to adjust claims for these 200 open claims without incurring significant expense or inconvenience. *Id.* (citing Brownfield Decl. ¶ 23). Neither party provided a declaration or other documents from a Tristar representative. Based on Clear Spring's Reply, it does not appear that Clear Spring now specifically disputes that Tristar is able to perform its duties as a TPA. *See generally*, Reply.

In the Declaration of Nicole Beal, executed August 17, 2021, she states that "Lackawanna Casualty Company [(Lackawanna)], Clear Spring's affiliate, will serve as Clear Spring's designated successor administrator for the management and administration of Clear Spring policies, other than the claims handling that TriStar

8

would assume, and needs the data in the Victory Data Request to assume that role." Beal Decl. ¶ 26. Nowhere else in Clear Spring's briefs or accompanying evidence does Clear Spring identify Lackawanna as the successor MGA, nor does Clear Spring provide any information about its attempts to negotiate with Victory under Article IV(B) of the MGA Contract so that Victory may cooperate with Lackawanna to "orderly transfer [] all functions."

On September 8, 2021, Victory also transferred all data relating to claims files and policy files directly to Clear Spring. Resp. at 7 (citing Brownfield Decl. ¶ 24). This data was also contained in Excel Spreadsheets, PDFs, Microsoft Word documents, Microsoft Power Point documents, JPEG images and Microsoft Outlook emails. *Id.* (citing Brownfield Decl. ¶ 24). All of these documents are electronic and contain data. *Id.* (citing Brownfield Decl. ¶ 24).

On September 13, 2021, the day before filing its Response to the PI Motion, Victory wrote to Clear Spring with an offer to continue to service Clear Spring policies beyond October 2, 2021, to December 31, 2021, if Clear Spring authorized Victory to "immediately withdraw $300,000 from the CS's Montana FIB premium or claims bank accounts." R. 50, Reply (citing St. Pierre Suppl. Decl. ¶ 3; *id.* Exh. 1). The offered fee of $100,000 per month is greater than the parties' previously negotiated rate of 6% of earned premium. *Id.* at 4 (citing St. Pierre Suppl. Decl. ¶ 4).

On August 17, 2021, Clear Spring filed the instant Motion for Entry of Preliminary Injunctions, requesting: (1) a preliminary mandatory injunction ordering Victory to provide Clear Spring with all Clear Spring Data necessary to transfer the

management and administration of Clear Spring's policies to a successor administrator; and (2) a preliminary prohibitive injunction ordering Victory not to abandon its ongoing management and administration of Clear Spring's policies until the successor administrator has the data and is operational. PI Mot. at 1. Clear Spring maintains that it is entitled to injunctive relief because it: (1) has a strong likelihood of success on the merits; (2) lacks an adequate remedy at law; (3) will suffer irreparable harm if injunctive relief is denied; (4) Victory will not suffer substantial harm by the grant of relief; and (5) the public interest will be served by the grant of relief. *Id.* at 1–2; PI Memo. at 10–15. Clear Spring seeks injunctive relief via Count VIII of the Second Amended Complaint (SAC), which requests injunctive relief for breach of the MGA Contract, the April 28, 2021 Agreement, and/or the May 27, 2021 Compensation Agreement, or alternatively breach of fiduciary duties.[6] PI Memo. at 7–8.

Victory counters that the Court should deny Clear Spring's Motion because Victory fails to satisfy the elements for issuance of injunctive relief. Resp. to Prelim. Inj. Specifically, Victory argues that Clear Spring has been provided with all of the Clear Spring Data, and that the MGA Contract does not require Victory to turn over the Clear Spring Data in a particular format. *Id.* at 1. Both parties submitted declarations and other evidence in support of their respective Motion and Response.

---

[6]Although the Parties continue to litigate alleged breaches alleged breaches of the MGA contract committed by both Parties during its life, Clear Spring's requested injunctions are sought only based on Victory's alleged post-termination breaches of the MGA contract, the April 28, 2021 Agreement, the May 27, 2021 Compensation Agreement, and/or the fiduciary duties inherent in the parties' ongoing principal-agent relationship. PI Memo. at 2.

After the filing of Clear Spring's Response, Clear Spring filed a Reply, along with a supplemental declaration in support of its Motion for Preliminary Injunctions. Reply; St. Pierre Suppl. Decl. The Court denied Victory's request to strike the Reply and supplemental Declaration (R. 53), but allowed Victory to file a Sur-Response and supplemental declaration addressing the information in Clear Spring's supplemental declaration. R. 54. Victory subsequently filed a Sur-Reply, R. 55, Sur-Resp. and supplemental declaration, R. 56, Brownfield Suppl. Decl.

## Standard of Review

A party seeking a preliminary injunction is required to demonstrate: (1) a likelihood of success on the merits, (2) that it has no adequate remedy at law, and (3) that it will suffer irreparable harm if the relief is not granted. *Promatek Indus., Ltd. v. Equitrac Corp.*, 300 F.3d 808, 811 (7th Cir. 2002), *as amended* (Oct. 18, 2002). The Seventh Circuit recently clarified how likely success on the merits must be in order to satisfy the standard. *Ill. Republican Party v. Pritzker*, 973 F.3d 760, 762 (7th Cir. 2020). The Court explained that a "possibility of success is not enough" and "[n]either is a better than negligible chance." *Id.* (internal citations and quotations omitted). But the moving party "need not show that it definitely will win the case." *Id.* at 763. "A strong showing" of a likelihood of success on the merits thus "normally includes a demonstration of how the applicant proposes to prove the key elements of its case." *Id.* (internal citations and quotations omitted).

There are two types of preliminary injunctions: those that are prohibitive and preserve the status quo, and those that are mandatory and require an affirmative act

by the defendant. *Mays v. Dart*, 974 F.3d 810, 818 (7th Cir. 2020). "Mandatory preliminary injunctions . . . are ordinarily cautiously viewed and sparingly issued." *Id.* (internal quotation and citation omitted); *see also Graham v. Medical Mut. of Ohio*, 130 F.3d 293, 295 (7th Cir. 1997) (mandatory injunctions can be justified only upon "the clearest equitable grounds"); *ChoiceParts, LLC v. Gen. Motors Corp.*, 203 F. Supp. 2d 905, 914 (N.D. Ill. 2002) (a mandatory injunction "is inappropriate unless the law and facts clearly favor the plaintiff") (internal quotation and citation omitted).

If the moving party meets this three-element threshold showing, the court "must weigh the harm that the plaintiff will suffer absent an injunction against the harm to the defendant from an injunction." *GEFT Outdoors, LLC v. City of Westfield*, 922 F.3d 357, 364 (7th Cir. 2019) (internal quotation and citation omitted). "Specifically, the court weighs the irreparable harm that the moving party would endure without the protection of the preliminary injunction against any irreparable harm the nonmoving party would suffer if the court were to grant the requested relief." *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of the U.S.A., Inc.*, 549 F.3d 1079, 1086 (7th Cir. 2008) (citing *Abbott Labs. v Mead Johnson & Co.*, 971 F.2d 6, 11–12 (7th Cir. 1992)). The Seventh Circuit has described this balancing test as a "sliding scale": "if a plaintiff is more likely to win, the balance of harms can weigh less heavily in its favor, but the less likely a plaintiff is to win[,] the more that balance would need to weigh in its favor." *GEFT Outdoors*, 992 F.3d at 364 (internal quotation and citation omitted). Finally, the court must consider the interests of non-parties in granting or denying the requested relief. *Ty, Inc., v. Jones Grp., Inc.*, 237 F.3d 891,

895 (7th Cir. 2001). It is within this framework that the Court analyzes the PI Motion. It is within this framework that the Court analyzes Clear Spring's Motion for Preliminary Injunctions.[7]

## Analysis

## I.    Motion for Judicial Notice

As a preliminary matter, the Court addresses Clear Spring's Opposed Motion for Judicial Notice, in which Clear Spring requests that the Court take notice of the Proposed Agency Action Against Victory, which was published on the Montana Commissioner's website, on September 30, 2021. Mot. Judicial Not. at 1. The Proposed Agency Action Against Victory is accessible to the public at https://csimt.gov/legal-actions/, under the section entitled "Insurance Legal Actions," as In the Matter of Victory Insurance Company, Case No. INS 2021-313A, and may be downloaded by the public as https://csimt.gov/wp-content/uploads/2021-09-30-Notice-of-Proposed-Agency-Action-and-Opportunity-for-Hearing-Victory-Insurance-Co.pdf. *Id.* Although the Court would ordinarily allow Victory to respond to an opposed motion, given the time-sensitive nature of Clear Spring's Preliminary Injunction Motion and the clarity of the law on Clear Spring's request for judicial notice, the Court decides the motion based only on Clear Spring's filing.

The Court may take "judicial notice of matters which are so commonly known within the community as to be indisputable among reasonable men, or which are

---

[7]The Court notes that Federal Rule of Civil Procedure 65(a) does not require an evidentiary hearing, and a hearing is generally not required if a defendant's response to a motion for preliminary injunction fails to create a genuine issue of material fact. *In re Aimster Copyright Litig.*, 334 F.3d 643, 653–54 (7th Cir. 2003).

capable of certain verification through recourse to reliable authority." *McCray v. Hermen*, 2000 WL 684197, at \*2 n.1 (N.D. Ill. May 23, 2000) (quoting *Green v. Warden, U.S. Penitentiary*, 699 F.2d 364, 369 (7th Cir. 1983)). "Included in these matters are 'proceedings in other courts, both within and outside of the federal judicial system, if the proceedings have a direct relation to matters at issue.'" *Id.* (quoting same*); see also Ennenga v. Starns*, 677 F.3d 766, 774 (7th Cir. 2012) ("Taking judicial notice of matters of public record need not convert a motion to dismiss into a motion for summary judgment."). Most relevant here, in *Denius v. Dunlap*, 330 F.3d 919, 926 (7th Cir. 2003), the Seventh Circuit collected cases and found that information published on a government website is the proper subject of judicial notice.

Therefore, the Court considers the Proposed Agency Action Against Victory. However, it is important to note that the Proposed Agency Action Against Victory was filed on September 30, 2021 (just one day before the issuance of this Opinion), and allows Victory to contest the Proposed Agency Action Against Victory by requesting an administrative hearing within 24 days of the Notice. Mot. Judicial Not., Exh. A, Montana Notice at 17. Because Victory has not filed a Response to Clear Spring's Motion for Judicial Notice, the Court does not know whether Victory intends

14

to contest the Proposed Agency Action Against Victory, but given the information before the Court, it finds that there is a reasonable likelihood that Victory will do so.

## II.     Likelihood of Success on the Merits

The Court begins its analysis of Clear Spring's Preliminary Injunction Motion with whether Clear Spring has established a clear likelihood of success on its claims that Victory: (1) breached the formal MGA Contract, (2) breached the Informal Agreements, and/or (3) breached its fiduciary duties. Because Clear Spring requests not only a prohibitive injunction but also a mandatory injunction, it must demonstrate that "the law and facts clearly favor" Clear Spring. *See ChoiceParts*, 203 F. Supp. 2d at 914.

### A.     Breach of MGA Contract

To state clam for breach of contract under Illinois law, a plaintiff "must allege (1) the existence of a valid and enforceable contract; (2) substantial performance by the plaintiff; (3) a breach by the defendant; and (4) the resultant damages." *Hongbo Han v. United Cont'l Holdings., Inc.*, 762 F.3d. 598, 600 (7th Cir. 2014) (internal citations and quotations omitted).

### 1. Enforceability of Post-Termination Obligations

Clear Spring maintains that it satisfies the likelihood of success on its breach of contract count.  In support of its position that courts often impose and enforce post-termination obligations on the contracting parties, Clear Spring cites *7-Eleven, Inc. v. Spear*, 2011 WL 830069, at *5 (N.D. Ill. Mar. 3, 2011). In *7-Eleven*, the Court granted the plaintiff's preliminary injunction motion and ordered the franchisee

defendants to perform their post-termination obligations under the terminated franchise agreement, including obligations to immediately deliver and surrender full and complete possession of the store, equipment, and inventory to the plaintiff franchisor. 2011 WL 830069, at *5. Clear Spring also argues that *Hayes v. Ohio National Financial Services*, 642 F. Supp. 2d 456 (E.D. Pa. 2009) is instructive. PI Memo. at 7. In *Hayes*, the contract provided that, on termination of the agreement, the insurer's general agent "shall turn over to the Company all monies, receipts, notes, reports, policyowner records, books, stationery, blanks, forms, computer disks and software of any kind and any other property of the Company." *Hayes*, 642 F. Supp. 2d at 459. The agent refused to turn over the policyholder information post-termination, and the insurer sought a permanent injunction forcing the agent to do so. *Id.* at 460–62. Applying Ohio law and explaining that the contract "explicitly direct[ed]" the agent to "turn over all their clients' policyholder information," the court found that the contract "clearly confirm[ed] that the policyowner records referred to [were] 'property of the [insurer].'" *Id.* at 465. The court held that, based on the contract's plain language, the insurer "own[ed] that information" and the agent was required to turn it over, and granted the injunction. *Id.* Although only persuasive authority, the Court agrees with the reasoning in *Hayes*: here, Article IV(B) of the MGA Contract requires Victory to "turn over" the Clear Spring Data upon termination of the contract. MGA Contract Art. IV(B). By the plain language of the MGA Contract, that requirement is indeed enforceable after the contract's termination. In fact, since Clear Spring filed its Motion for Preliminary Injunctions,

16

Victory has "turned over" all of the Clear Spring Data as of September 8, 2021. Brownfield Decl. ¶ 24. The crux of the Parties' dispute, now, is whether the MGA requires the Clear Spring Data to be turned over in a particular *format*, which the Court addresses in the following Section.

As an initial matter, Victory argues that, because Clear Spring terminated the MGA Contract, its request for specific performance (production of the Clear Spring Data in a particular format) is barred. Resp. at 9–10 (citing *Lone Star-Cardinal Motorcycle Ventures VIII, LLC v. BFC Worldwide Holdings, Inc.*, 2016 WL 3671504, *3–4 (N.D. Ill. 2016); *JNS Power & Control Sys., Inc. v. 350 Green, LLC*, 624 F. App'x 439, 445 (7th Cir. 2015); *McCormick Rd. Assocs., L.P. II v. Taub*, 659 N.E.2d 52, 54 (Ill. App. Ct. 1995); *Rotogravure Serv., Inc. v. R. W. Borrowdale Co.*, 395 N.E.2d 1143, 1150 (Ill. App. Ct. 1979)). The Court agrees with Clear Spring that the cases cited by Victory are distinguishable, and where a contract provides for a post-termination obligation, that obligation is enforceable. Reply at 6.

In *Lone Star-Cardinal*, the court found that the contract, which the plaintiff had terminated, did not provide for specific post-termination remedies—rather, it provided that, "upon termination the injured party can pursue its remedies against the breaching party; the remedies are not prescribed" and that, although "specific performance is an available remedy in the event of [defendant's] default, [] nothing in this provision suggests that [plaintiff] remains "entitled" to that remedy after terminating the contract." 2016 WL 3671504, at *3–4. Both *JNS Power* and *McCormick* stand for the general proposition that, "[t]o state a cause of action for

17

specific performance, there must first be a valid, binding, and enforceable contract," but neither deal with post-termination obligations articulated in the at-issue contracts. *JNS Power*, 624 F. App'x at 445 (citing *McCormick*, 659 N.E.2d at 54); *see also Rotogravure Serv.*, 395 N.E.2d at 1150 (finding that "the plaintiff's claim for the cost of the additional equipment and for the loss of future profits [was] irreconcilable and inconsistent with its claim for specific performance" but not in terms of a termination clause mandating certain obligations).

### 2. MGA Contract's Post-Termination Terms

In its opening PI Motion, Clear Spring requests an injunction requiring Victory to provide all of the Clear Spring Data (which Victory represents it has now done, *see* Brownfield Decl. ¶ 24), "in the time and *format* required for a Clear Spring designated successor to ensure uninterrupted service of Clear Spring policyholders." PI Memo. at 1 (emphasis added). It explains that it needs the Clear Spring Data "in a format capable of being downloaded to an electronic platform of a reasonable industry standard." *Id.* Clear Spring does not further specify the necessary format to achieve this in its Motion, although in its Reply, it clarifies that its position is that the MGA Contract requires that Victory turn over the Clear Spring Data in .csv and/or native Excel format. Reply at 10. As noted above, Clear Spring's Assistant Vice President of Business Operations has attested that Clear Spring "cannot simply input information from hard copy documents or PDFs," because "[t]o do so would require thousands of work hours at enormous expense to Clear Spring and might take a year or more to accomplish." Reply at 3 (quoting Beal Decl. ¶ 19).

18

Victory insists that "the plain language of the MGA [C]ontract only require[s] Victory to 'turn-over' records [and t]here is no data specific (or electronic) transfer requirement." Resp. at 1, 3, 5–6; Sur-Resp. at 3. Victory argues that Clear Spring seeks to obtain the Clear Spring Data "in a different and specific format so that it can obtain the new proprietary [Insurity] software system and database developed by Victory. Resp. at 1. It also provides evidence that it has produced to Clear Spring all data relating to claims files and policy files directly to Clear Spring, which was contained in Excel Spreadsheets, PDFs, Microsoft Word documents, Microsoft Power Point documents, JPEG images and Microsoft Outlook emails. *Id.* at 7.

Victory is correct that Section IV(B) of the MGA Contract does not specify the format in which the Clear Spring Data must be turned over, whereas other provisions of the MGA Agreement *do* specify that the Clear Spring Records must be maintained or provided to Clear Spring "in a form usable by" or "as directed by" Clear Spring, *see* MGA Contract Art. II(D)(3)–(4). But, as Clear Spring points out in its Motion, where a contract is silent or ambiguous, a court may look to course of performance, course of dealing, usage, and the parties' practical construction of the contract through their subsequent actions, to determine the parties' intent. PI Memo. at 9 (citing *In re Ganske*, 2021 WL 1396563, at *4 (Bankr. E.D. Wis. Mar. 5, 2021) (collecting cases and applying Illinois law)). So, even though the provision requiring Victory to turn over the Clear Spring Data does not specify the format in which Victory must provide the Clear Spring Data, that is not the end of the inquiry.

19

Article IV(B) goes on to provide that, upon termination of the MGA Contract and "[s]ubject to agreement between the parties, [Victory] will be paid a reasonable negotiated fee to: (1) Cooperate with any successor MGA in the *orderly transfer of all functions. . . .*" MGA Contract Art. IV(B)(1). The transfer of data in formats that require thousands of hours of conversion likely cannot be considered an "orderly transfer." Of course, as noted above, although Clear Spring has identified Lackawanna as the successor MGA in just one declaration submitted to the Court, it has not provided any evidence about its attempts to negotiate with Victory under Article IV(B) of the MGA Contract so that Victory may cooperate with Lackawanna to "orderly transfer [] all functions." So the Court cannot conclude that Victory has had the opportunity to negotiate a fee to "cooperate" with a successor MGA as contemplated by Article IV(B). Still, this clause suggests that the parties likely anticipated that Victory must transfer the Clear Spring Data in a *usable* format.

Clear Spring also argues that the Montana Insurance Code mandates that Victory provide the Clear Spring Data in a certain format, whereas Victory contends that the Montana Insurance Code provides no such right. PI Memo. at 9; Resp. at 3–4. The Court agrees with Victory that Section 33-2-1602 does not impart any rights on either party, but rather simply dictates certain terms that must be present in an agreement between an insurer and MGA. *Id.* (citing Mont. Code Ann. § 33-2-1602). Because it contains requirements for what the parties must include in an agreement governing the MGA relationship, it may be helpful to interpret the MGA Contract, however. And it states that an MGA agreement must contain a provision providing

20

that "[t]he insurer has access to and may copy all accounts and records that are related to its business, *in a form usable by the insurer*." Mont. Code Ann. § 33-2-1602(4) (emphasis added). Still, because the MGA Contract is now terminated, Section 33-2-1602 does not create rights or terms outside of that Contract.

The Court also agrees with Victory's more limited interpretation of Section 33-17-611. PI Memo. at 9; Resp. at 4 (citing Mont. Code. Ann. § 33-17-611). Section § 33-17-611 specifies that "for 5 years" after termination of the MGA Contract, the MGA must "maintain at its principal administrative office adequate books and records of all transactions between the administrator, insurers, and insured persons . . . in accordance with prudent standards of insurance recordkeeping." Mont. Code Ann. § 33-17-611. It goes on to state that, "[t]he insurer retains the right to continuing access to those books and records of the administrator sufficient to permit the insurer to fulfill all of its contractual obligations to insured persons, subject to any restrictions in the written agreement between the insurer and the administrator." *Id.* (emphasis added). Victory argues that Section 33-17-611 is inapplicable to the required format of all Clear Spring Data because it states that only "books and records," and not *data* of the insured must be retained and accessible. Resp. at 4. Although the Montana Insurance Code does not define "books and records," based on a review of the Code as a whole, it appears that "books and records" are contemplated to be separate from at least "files, bank accounts, accounts, and documents." *See, e.g.*, Mont. Code. Ann. §§ 33-2-1309(1)(j), 33-2-1708, 33-4-316. So it is unlikely the Montana legislature meant to require MGAs to "maintain" *all* of the insurer's data or

allow inspection by the insurer of all of its data for up to five years. But still, Section § 33-17-611 makes clear that, after termination of the MGA contract, it is important that the insurer be able "to fulfill all of its contractual obligations to insured persons." And to be able to do so, it is axiomatic that Clear Spring have the Clear Spring Data in a *usable* format.

But what does "usable" mean here? According to evidence proffered by Clear Spring, "[a] usable format means that the data is capable of being downloaded to an electronic platform of reasonable industry standard, without manual entry of data or other unreasonable effort or expense." Beal Decl. ¶ 18. Beal attests that converting the Clear Spring Data from PDFs to a usable format "would require thousands of work hours at enormous expense to Clear Spring and might take a year or more to accomplish." Beal Decl. ¶ 19. Victory provides opposing evidence, as its President and CEO attested that, "[i]f the roles were reversed and Victory were in Clear Spring's position, Victory would be able to utilize the data transferred to Clear Spring and Tristar to adjust claims, service policyholders and claimants, and report to state regulators without incurring significant expense or inconvenience just as Victory did at the time of the parties entered into the MGA Contract." Brownfield Decl. ¶ 25. As noted above, Victory has provided the Clear Spring Data in multiple formats, including Excel Spreadsheets and PDFs. *Id.* ¶ 24.

In its Reply, Clear Spring states that the "data" Victory transferred on September 8, 2021 was overwhelmingly provided in PDF format, regardless of a given document's native format. Reply at 2. But, inexplicably, Clear Spring did not provide

evidence in support of that proposition in the Supplemental Declaration submitted with its Reply. Nor does it provide evidence that the data provided on September 8, 2021 is not "usable."

As discussed above, mandatory preliminary injunctions require the movant to meet a very high standard, and are "sparingly issued." *See Mays*, 974 F.3d at 818. Although it is a close call, given that the MGA Contract does not explicitly provide that Clear Spring must provide the Clear Spring Data in a specific format upon termination of the MGA Contract, and there is no evidence before the Court that Victory's September 2, 2021 production is "unusable," the Court does not find that the law and facts *clearly* favor Clear Spring such that a mandatory injunction should issue. *See ChoiceParts*, 203 F. Supp. 2d at 914.

Moreover, the Parties are currently engaged in discovery, supervised by Magistrate Judge Kim. R. 15; R. 17. The Court understands that the Parties are litigating a discovery dispute over the format and timing of the production of the Clear Spring Data via the discovery process. R. 59. The Court finds the discovery process to be a more appropriate avenue than a mandatory injunction to seek the production of documents—even production in a particular format. *See Haywood v. Wexford Health Sources, Inc.*, 2021 WL 2254968, at *7–8 (N.D. Ill. June 3, 2021) (requiring party to produce discovery as Excel files rather than PDF copies). Clear Spring's ability to obtain the Clear Spring Data in discovery negates a finding that the "clearest equitable grounds" mandate an affirmative injunction. *See Graham*, 130 F.3d at 295.

23

Still, as discussed above, the Court finds that it is likely (if not *clearly* likely) that Clear Spring will prevail on its breach of contract claim, in that it needs usable data to be able to transfer Victory's functions to a successor MGA and service its policyholders' accounts after October 2, 2021. As such, the Court will analyze the remaining preliminary injunction factors as to Clear's Spring's request the Court order Victory not to abandon its ongoing management and administration of Clear Spring's policies until the successor administrator has the data and is operational.

### B.  Breach of Informal Agreements and Fiduciary Duties

The parties both give fairly short shrift to the arguments relating to Victory's alleged breach of the Informal Agreements and breach of fiduciary.

The same breach of contract elements apply to the Informal Agreements as to the MGA Contract. Although the Informal Agreements require Victory to continue servicing Clear Spring's accounts, there is a dearth of information about any specific terms negotiated (apart from payment), and certainly not enough information that would allow this Court to find that the Informal Agreements require Victory to provide the Clear Spring Data in a particular format where the MGA Contract does not clearly do so. *See* Deola Decl. ¶ 15; Brownfield Decl. ¶ 17.

To state a claim for a breach of fiduciary duty, a plaintiff must allege that: (1) a fiduciary duty exists; (2) the defendant breached that fiduciary duty; and (3) damages proximately resulted from the breach. *Freedom Mortg. Corp. v. Burnham Mortg., Inc.*, 720 F. Supp. 2d 978, 997 (N.D. Ill. 2010). Although Victory does not explicitly dispute that, by virtue of the Informal Agreements, it is Clear Spring's

24

fiduciary, it argues that it has no duty to transfer the Clear Spring Data to Clear Spring in a particular format. For the same reasons discussed in the context of the MGA Contract, the Court finds this to be a close call, which is not sufficient to warrant mandatory injunctive relief. However, as noted above, the Court will determine whether the other preliminary injunctive factors warrant granting Clear Spring's requested prohibitive relief.

### III.    Adequate Remedy at Law/Irreparable Harm

Beyond demonstrating a likelihood of success on the merits, Clear Spring must also show that it has no adequate remedy at law and will suffer irreparable harm if the Court does not grant injunctive relief. These two requirements—irreparable harm and no adequate remedy at law—tend to merge. *See Roland Mach. Co. v. Dresser Indus., Inc.,* 749 F.2d 380, 386 (7th Cir. 1984); *see also Life Spine, Inc. v. Aegis Spine, Inc.*, 8 F.4th 531, 545 (7th Cir. 2021) ("Harm is irreparable if legal remedies are inadequate to cure it.") (citation omitted); *Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 386 (7th Cir. 1984) ("In saying that the plaintiff must show that an award of damages at the end of trial will be inadequate, we do not mean wholly ineffectual; we mean seriously deficient as a remedy for the harm suffered."). Irreparable injuries can include loss of "reputation or goodwill," *Walgreens Co. v. Peters*, 2021 WL 3187726, at *5 (N.D. Ill. July 28, 2021), and harm to "competitive position[] and continuity of business relationships," which are "oftentimes fatal to businesses, and cannot be readily" cured by monetary damages, *GCM Partners, LLC*

*v. Hipaaline Ltd.*, 2020 WL 6867207, at *14 (N.D. Ill. Nov. 23, 2020), *appeal dismissed*, 2021 WL 2660013 (7th Cir. Apr. 21, 2021) (collecting cases).

As noted above, the Court only evaluates the remaining factors as to Clear Spring's requested prohibitive injunctive relief, that the Court order Victory not to abandon its ongoing management and administration of Clear Spring's policies until the successor administrator has the data and is operational. Clear Spring argues that, absent the preliminary injunction, Clear Spring will suffer immediate and irreparable injury to its policyholder relationships, reputation, and goodwill, as well as regulatory consequences. PI Memo. at 11. Clear Spring points to the Montana Department of Insurance's August 11, 2021 letter advising the parties that it was considering an enforcement action, as evidence that, absent the requested injunction, its future business is at risk. PI Memo. *Id.* at 12–13. Even more compelling, in support of a finding that Clear Spring's business is at risk is the Proposed Agency Action Against Victory, published by the Montana Commissioner on September 30, 2021. Moreover, Clear Spring contends that if Victory stops administering the policies on October 2, 2021, and Clear Spring and/or the successor MGA does not have the Clear Spring Data in a usable format and therefore is unable to assume Victory's MGA duties, the risk of irreparable injury to Clear Spring's reputation and goodwill will be even greater, and eventually harm Clear Spring's competitive position in the insurance marketplace and the continuity of its relationships with its policyholders and its regulators. *Id.* 11–13.

Victory counters that Clear Spring has only itself to blame for any loss of customer goodwill or damage to its reputation, because Clear Spring (1) terminated the MGA Contract; (2) determined to send notices of non-renewal to all policyholders; and (3) did not retain a third-party (claims) administrator until August 11, 2021. Resp. at 9. The Court does find it somewhat perplexing that Clear Spring did not identify a successor TPA until August 11, 2021, Brownfield Decl. ¶ 12, or a successor MGA until on or about August 17, 2021, Beal Decl. ¶ 26, (and it is unclear from the evidence whether Clear Spring has informed Victory of the successor MGA). Still, according to evidence provided *by Victory*, Victory did not provide much of the Clear Spring Data until September 8, 2021, Brownfield Decl. ¶ 24, despite Clear Spring's repeated requests for it beginning in May 2021, Hanfling Decl. ¶¶ 11, 21, 23, 28–29. Moreover, Victory does not point to any cases in support of a finding that a party will *not* suffer irreparable harm based on the loss of customer goodwill or damage to its reputation solely because some of that harm is caused by the actions of the party seeking the injunction. *See* Resp. at 9.

The Court agrees with Clear Spring that *GCM Partners* is instructive. In that case, a healthcare service contracted with a software company to provide telehealth services through the company's online platform. 2020 WL 6867207, at *1. The parties' agreement provided that patient data submitted through the platform was "the sole property of" the healthcare service. *Id.* at *4. When the parties' relationship broke down, the software company disabled the healthcare service's access to the platform, and the healthcare service sued. *Id.* at *5–7. In granting a preliminary injunction

27

barring the software company from "disabling, suspending, or otherwise removing [the healthcare service]'s access to the . . . platform," the court agreed that the healthcare service would likely suffer irreparable harm without an injunction. *Id.* at *14–15. at *44–47. Having its access to the platform cut off would cause the healthcare service to "lose its relationship with its patients and medical providers" as well as the "goodwill" it had generated. *Id.* at *14; *see also Hayes*, 642 F. Supp. 2d at 469 (finding was no legal remedy available "to vindicate [the insurer's] property rights"; that is, to compensate the insurer for the loss of its policyholder information). Notably, Victory failed to address, much less distinguish *GCM Partners*.

Therefore, the Court finds that Victory has adequately established that it will suffer irreparable harm with no adequate remedy at law absent an injunction requiring Victory to continue its ongoing management and administration of Clear Spring's policies.

### IV.    Balancing the Harms

Next, the Court must balance the harms to the parties. *Promatek Indus.*, 300 F.3d at 813. To determine the balance of equities, a "court must weigh the harm the denial of the preliminary injunction would cause the plaintiff against the harm to the defendant if the court were to grant it." *Mays*, 974 F.3d at 818. However, the Seventh Circuit's "'sliding scale' approach" means that "the more likely the plaintiff is to win on the merits, the less the balance of harms needs to weigh in [its] favor, and vice versa." *Id.*

Clear Spring argues that the equities favor Clear Spring, as Victory will be compensated for its continued management and administration of Clear Spring policies following termination of the MGA Contract. PI Memo. at 14. Victory's Response addresses only the harm that it would suffer if the Court were to issue Clear Spring's requested mandatory injunction. Resp. at 12–13. In its Cross-Response, Victory argues only that it may be harmed by an injunction requiring it to continue administering and managing Clear Spring's policies beyond October 2, 2021 because it would be "losing money" under Clear Spring's proposed fee arrangement. Cx-Resp. at 5. Such harm is not "irreparable," as Victory could seek damages for any lost revenue and costs. *See Roland Mach. Co. v. Dresser Industries, Inc.*, 749 F.2d 380, 387 (7th Cir. 1984).

Because the Court finds that Clear Spring would suffer irreparable harm absent injunctive relief, whereas any potential harm Victory may suffer is compensable via damages, the Court finds that the equities weigh in Clear Spring's favor.

## V. Public Interest

Finally, the Court should balance any effects that granting or denying the preliminary injunction would have on non-parties, a factor some courts refer to as "the wild card that is the 'public interest.'" *Lawson Products, Inc. v. Avnet, Inc.*, 782 F.2d 1429, 1433 (7th Cir. 1986). Here, the non-parties are the public and, most likely, Clear Spring's Montana policyholders.

Clear Spring argues that the preliminary injunctions will serve the public interest by ensuring the proper and uninterrupted administration of Clear Spring policies. PI Memo. at 14–15. It points out that, "Illinois courts, like courts throughout the nation, have found that the insurance industry is a necessity affected with a vital public interest." *Id.* at 15 (citing *Gen. Ins. Co. of Am. v. Clark Mali Corp.*, 2010 WL 1286076, at *6 (N.D. Ill. Mar. 30, 2010) (citing *Lincoln Towers insurance Agency, Inc. v. Boozell*, 684 N.E.2d 900, 903 (Ill. App. Ct. 1997))).

As with the balance of harms, Victory's only argument regarding the public interest relates to Clear Spring's request for a mandatory injunction; it does not argue that the public interest would be harmed by an injunction requiring Victory to continue its management and administration of Clear Spring's policies.

The Court agrees with Clear Spring that injunctive relief would serve the public interest by protecting Clear Spring policyholders, individuals bringing claims under Clear Spring policies, and medical providers and other vendors servicing those claimants. PI Memo. at 15.

## VI. Other Practical Matters

### A. Length of Continuing Policy Management and Administration

Clear Spring requests that the Court enter an injunction requiring Victory "not to abandon its ongoing management and administration of Clear Spring's policies until the successor administrator has the data and is operational." PI Memo. at 1. However, as noted above, the Court is troubled by Clear Spring's inexplicable delay in finding and identifying a successor MGA. The only reference to a successor MGA

that the Court is aware of is one reference to Lackawanna in Ms. Beal's declaration. Beal Decl. ¶ 26. But Clear Spring presents no evidence that it has notified Victory of the successor MGA's identity or begun any transfer process. The Court declines to order Victory to continue managing and administering Clear Spring's policies indefinitely. Therefore, as described in more detail below, the Clear Spring must identify the identity of the successor MGA in a filing to the Court on or before October 21, 2021. For now, the Court will order Victory to continue its management and administration duties until December 31, 2021.

### B. Compensation for Continuing Policy Management and Administration

The parties dispute how much Victory should be paid to continue its policy management and administration past October 2, 2021. Clear Spring requests that Victory continue to be compensated at the parties' previously negotiated compensation rate of 6% earned premium. Reply at 4. On the other hand, Victory requests payment of $100,000.00 per month, and presents evidence that the "fees and expenses Victory was receiving under the MGA Contract, the April 28, 2021, Agreement and the May 27, 2021 Compensation Agreement were higher than the $100,000 per month." Sur-Resp. at 5 (citing Brownfield Suppl. Decl. ¶ 4). But generally, a prohibitive injunction is meant to "maintain the status quo." *See Chicago United Indus., Ltd. v. City of Chicago*, 445 F.3d 940, 944–46 (7th Cir. 2006) (noting that "temporary restraining orders and preliminary injunctions are intended to 'preserve the status quo' is indeed a common formula" but criticizing that formula and ultimately declining to decide the issue).

Based on the information before the Court, it sees no persuasive basis to change the parties' most recent compensation agreement. Clear Spring is directed to compensate Victory at the same rate of compensation for providing its current policy management and administration duties as it has been to date; that is, a fee of six percent (6%) of all Clear Spring earned premium (earned monthly) to be paid monthly and netted from collected Clear Spring premiums in connection with Clear Spring's run-off of its business which Victory was administering. *See* May 27, 2021 Compensation Agreement.

## C. Bond

Under Rule 65(c), "the court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." FED. R. CIV. P. 65(c). "The purpose of an injunction bond is to compensate the defendant, in the event he prevails on the merits, for the harm that an injunction entered before the final decision caused him." *Ty, Inc. v. Publications Int'l Ltd.*, 292 F.3d 512, 516 (7th Cir. 2002) "The appropriate amount of the bond is subject to the court's discretion." *Monster Energy Co. v. Wensheng*, 136 F. Supp. 3d 897, 910 (N.D. Ill. 2015). But the Seventh Circuit has stated that "[w]hen setting the amount of security, district courts should err on the high side." *Mead Johnson & Co. v. Abbott Labs.*, 201 F.3d 883, 888 (7th Cir.), amended on other grounds, 209 F.3d 1032 (2000). A defendant would still have to prove its loss, so "[a]n error in setting the bond too high is . . . not serious." *Id.* But "an error in the

other direction produces irreparable injury, because the damages for an erroneous preliminary injunction cannot exceed the amount of the bond." *Id.*

The Parties' requests for bond amounts vary greatly—Victory requests a $2 million bond and Clear Spring a $1 bond—but the Parties' arguments as to both amounts are based entirely on Clear Spring's request for mandatory relief. Therefore, based on Victory's evidence that it will "lose money" by continuing to manage and administer Clear Spring's policies between October 2, 2021 and December 1, 2021, the Court determines that at least some more than negligible bond amount is warranted. As noted above, the Court has discretion to set a bond amount. It therefore sets the bond at $90,000.00.

## Conclusion

For the foregoing reasons, the Court partially denies Clear Spring's Motion for a Preliminary Injunction and partially grants the Motion, as modified below. The Court also grants Clear Spring's Motion for Judicial Notice. Accordingly, the Court orders that:

1. Victory is preliminarily enjoined from stopping its current policy management and administration on October 2, 2021, until December 31, 2021, at which time the Court expects that a successor MGA will have the Clear Spring Data and be operational in order to assume Victory's duties beginning on January 1, 2022. The Court will not extend this period absent extraordinary circumstances. For the period between October 2, 2021 through December 31, 2021, Victory will continue to be compensated at the same rate of compensation it was receiving under the parties' most recent agreement; namely, a fee of six

percent (6%) of all Clear Spring earned premium (earned monthly) to be paid monthly and netted from collected Clear Spring premiums in connection with Clear Spring's run-off of its business which Victory was administering.

2. By October 6, 2021 at 6:00 p.m., Clear Spring shall deposit with the Court ninety thousand dollars ($90,000.00), either cash or surety bond, as security.

3. The Parties are to file a status report by October 21, 2021, in which: (1) Clear Spring identifies the successor MGA; (2) the Parties describe the status of negotiations under Article IV(B) as to the payment of a "reasonable fee" to Victory to cooperate with the "successor MGA in the orderly transfer of all functions; and [p]rovide timely media transfer of data"; and (3) the Parties describe the status of the discovery dispute as to the Clear Spring Data being supervised by Judge Kim.

DATED: October 5, 2021

United States District Judge
Franklin U. Valderrama

34